**EXHIBIT B**

**Savini Declaration**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LIMITED STORES COMPANY, LLC, *et al.*,[1] | ) | Case No. 17-10124 (___) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF DURC SAVINI
## IN SUPPORT OF THE DEBTORS' SALE MOTION

I, Durc Savini, being duly sworn, state the following under penalty of perjury:

1. I am above 18 years of age, and I am competent to testify. I am a Senior Managing Director of Guggenheim Securities, LLC ("Guggenheim"), an investment bank that maintains an office at 330 Madison Avenue, New York, New York 10017. Guggenheim has been retained by the Debtors as their investment bank in connection with these chapter 11 cases.

2. Except as otherwise indicated, all facts set forth in this declaration (the "Declaration") are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information supplied by members of the Debtors' management, and the Debtors' other advisors. If called upon to testify, I could and would testify competently to the facts set forth herein on that basis.[2]

3. I am authorized to submit this Declaration on the Debtors' behalf, in support of the *Debtors Motion for Entry of (I) an Order (A) Approving Form and Manner of Notices,*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: Limited Stores Company, LLC (6463); Limited Stores, LLC (0165); and The Limited Stores GC, LLC (6094). The location of the Debtors' service address is: 7775 Walton Parkway, Suite 400, New Albany, Ohio 43054.

[2] Certain disclosures herein relate to matters within the personal knowledge of other professionals at Guggenheim and are based on information provided by them.

*(B) Scheduling a Bid Protections Hearing, an Auction, a Sale Hearing, and Establishing Dates and Deadlines Related Thereto, (C) Approving Procedures for the Assumption and Assignment of Executory Contracts, and (D) Granting Related Relief; (II) an Order (A) Approving Certain Bid Protections in Connection with the Sale of Certain of the Debtors' Assets and (B) Granting Related Relief, and (III) an Order (A) Approving the Asset Purchase Agreement Between the Debtors and the Purchaser, (B) Authorizing the Sale of Certain of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts, and (D) Granting Related Relief* (the "<u>Sale Motion</u>"), to which this Declaration is attached as **<u>Exhibit D</u>**.[3] In particular, I offer this Declaration in support of the Debtors' decision to enter into the Purchaser APA, to agree to the sale timeline contemplated therein, and to agree to certain Bid Protections associated therewith. As set forth below, I believe that the Debtors' entry into the Purchaser APA and agreement to the sale timeline contemplated therein and the Bid Protections are sound exercises of the Debtors' business judgment and both the Purchaser APA and the Bid Protections reflect reasonable terms that are the product of arms-length negotiations.

**Consummation of the Sale and Entry into the Purchaser APA
is a Sound Exercise of the Debtors' Business Judgment**

4. The Debtors' marketing efforts with respect to the Assets date back to mid-2015. At that time, the Debtors received an offer to enter into a joint venture (the "<u>2015 JV Offer</u>") pursuant to which the Debtors would sell a majority interest in the Intellectual Property to a potential buyer (the "<u>2015 JV Buyer</u>"). The transaction anticipated that the Debtors and the 2015 JV Buyer would then develop new sales channels, including wholesale, that would be

---

[3] Capitalized terms used but not defined herein shall have the meanings set forth in the Sale Motion, the Sale Notice Order (attached as **<u>Exhibit A</u>** to the Sale Motion), the Bid Protections Order (attached as **<u>Exhibit B</u>** to the Sale Motion), or the Sale Order (attached as **<u>Exhibit C</u>** to the Sale Motion), as applicable.

complementary to the company's existing brick and mortar and e-commerce businesses. The Debtors determined to reject the 2015 JV Offer, after which they entered into discussions with the 2015 JV Buyer and a third-party retail partner regarding the sale of the Debtors' entire business as a going concern. Ultimately, the parties were unable to negotiate an acceptable purchase price. Based on the Debtors' projections for the remainder of 2015 and 2016, the Debtors decided to forgo transaction opportunities at that time and revisit a potential transaction the following year.

5. The Debtors significantly underperformed their projections during 2016. After receiving an inquiry from the 2015 JV Buyer in September 2016, the Debtors elected to revisit the idea of monetizing their Intellectual Property, including through a construct similar to the 2015 JV Offer. Based in part on the financial performance of the Debtors' brick and mortar business, the Debtors believed at the time—and continue to believe—that selling or otherwise monetizing the Intellectual Property was the most likely path to maximizing the value of the Debtors' assets for the benefit of its stakeholders. Nevertheless, the Debtors also elicited proposals from potentially interested parties for the sale of the Debtors' entire business. In addition to engaging with the 2015 JV Buyer, the Debtors, with Guggenheim's assistance, initially solicited bids from three other potential buyers, two of whom signed non-disclosure agreements ("NDAs") and were provided access to confidential information regarding the Debtors' Intellectual Property, business, and other assets.

6. As a result of these efforts, the Debtors received one written, non-binding indication of interest to purchase a majority stake in a joint venture involving the Debtors' Intellectual Property.

3

PHIL1 5925148v.6

7. As the Debtors' operating performance continued to deteriorate, in late October 2016, the Debtors adjusted their marketing efforts, and began exploring sale transactions potentially involving a chapter 11 process. During this phase of the sale process, Guggenheim, on the Debtors' behalf reached out to 27 potential purchasers (including those that the Debtors had previously contacted). These potential purchasers included both financial and strategic counterparties, as well as entities that specialize in the liquidation of distressed retailers. Nineteen potential purchasers signed NDAs (or had already signed NDAs) and were provided access to confidential information about the Debtors and their assets, including the Assets that are the subject of the Sale Motion. The Debtors ultimately received five non-binding indications of interest from potential purchasers. Generally, all bids received by the Debtors during this time period contemplated the liquidation of the Debtors' existing inventory coupled with a separate sale of the Intellectual Property. Despite certain parties expressing verbal interest in a going concern transaction involving the Debtors' brick and mortar business, no party submitted a non-binding written indication of interest contemplating such a transaction.

8. After analyzing the bids received during this later process, the Debtors determined that a separate sale of the Intellectual Property, along with the pre-filing liquidation of the Debtors' remaining inventory would maximize the value of their assets for the benefit of their creditors. Accordingly, in mid-December 2016, the Debtors engaged Hilco Merchant Resources, LLC to assist with the liquidation of existing inventory and winding down the Debtors' brick and mortar locations and shifted focus to further marketing the Intellectual Property. Ultimately, two parties submitted written, non-binding indications of interest for the Intellectual Property and entered into formal asset purchase agreement negotiations with the Debtors. After several weeks of negotiations and further due diligence, the process culminated

4

in a bidding contest among those parties that resulted in the purchase price increasing by approximately 72%. The Purchaser prevailed, and on January 12, 2017, the Selling Debtors entered into the Purchaser APA, based on their firm belief that the Purchaser APA will maximize value for their estates.

9. In my judgment, consummating the Sale and entry into the Purchaser APA is in the best interests of the Debtors' estates and a sound exercise of the Debtors' business judgment. As set forth herein, the terms of the Sale and the Purchaser APA are the product of arm's-length negotiations, and a comprehensive and extended marketing process. The Purchaser is not affiliated with the Debtors in any way and has proceeded in good faith during the entirety of the Sale negotiation process. In light of the Sale negotiation process described above, I believe that proceeding with the Sale on the proposed timeline is in the best interest of the Debtors, their estates, and all parties in interest.

## The Proposed Bid Protections and Sale Procedures Are Appropriate Under the Circumstances

10. The Purchaser APA contemplates Bid Protections in the form of an expense reimbursement (in an amount not to exceed $500,000) and a three percent (3%) break-up fee. The Purchaser also demanded the timeline for the Sale set forth in the Purchaser APA and Sale Motion, as described in more detail below. The Bid Protections were a necessary component of the Purchaser's bid and I do not believe that the Purchaser would have submitted a proposal, let alone permitted such proposal to be subject to superior offers postpetition, without the Bid Protections. Accordingly, I believe that the benefit and value of the Purchaser APA outweighs the cost associated with the Bid Protections in the event of an overbid, and such overbid will compensate the Debtors for such costs.

5

11. Further, I believe that consummation of the Sale in accordance with the timeframe contemplated in the Sale Motion is reasonable and will maximize the value of the Assets and otherwise inure to the benefit of their estates. As set forth above, the Intellectual Property has been marketed extensively since 2015 and was the subject of a comprehensive auction process just prior to the commencement of these cases, which, in my judgment resulted in the highest and best value for the Intellectual Property. During the comprehensive auction process, both bidders insisted on similarly prompt timelines and deadlines as part of the sale. Significantly, the Purchaser may terminate the Purchaser APA if the Bid Protection Order is not entered before February 3, 2017 and the Sale Order is not entered before February 24, 2017. The Debtors negotiated in good faith to extend the originally proposed deadlines, and were successful in pushing those deadlines back several days; but, ultimately, a prompt timeline proved to be a critical and non-negotiable deal point for both buyers. After concluding the prepetition marketing and auction process, the Debtors determined, in their business judgment, that the Purchaser's offer represented the highest and best bid available, and that, despite the fast timeline, the Purchaser APA would likely result in a superior outcome for the Debtors' estates than would the alternative—letting both potential buyers walk away and starting a new sale process.

12. Accordingly, I believe that the proposed timeline is reasonable based upon the aforementioned process and the facts and circumstances of these cases, no parties in interest will be prejudiced by the proposed sale process, and that the Sale Hearing Notice and timeline is reasonably calculated to provide interested parties with sufficient notice of the Bid Protections Hearing, the Assumption Procedures, the Sale and the Sale Hearing. Also, in light of the extensive prepetition marking process, during which numerous parties signed NDA's and

conducted diligence, I believe that a longer process would not materially increase the Debtors' prospects of receiving a higher or better offer. It is speculative at this point whether extending the process would benefit the estate, and the cost and delay arising from a longer process could result in an inferior result and potentially allow the Purchaser to decline to participate.

13. Consequently, the proposed sale timeframe, in my opinion, strikes the correct balance of providing reasonable notice under the facts and circumstances here, while assuring that the highest value in the form of the Purchaser APA will be achieved. Similarly, the "first day" relief sought by the Sale Motion, which consists of approval of certain dates, deadlines, and notices, is, in my opinion, narrowly tailored to provide as much notice as possible to parties (including contract counterparties) of the bid protections, the sale, the objection and overbid deadlines, the likely overbid requirements, and the treatment of executory contracts and unexpired leases, while still adhering to the Purchaser's imposed deadlines.

14. For all the reasons set forth herein, I believe that the proposed Bid Protections and procedures related to Consummation of the Sale are the product of good-faith arms-length negotiations, will not hamper bidding, are reasonable and appropriate relative to the size, nature, and complexity of the proposed transaction, and should be approved.

[*Remainder of page intentionally left blank*]

PHIL1 5925148v.6

Pursuant to 28 U.S.C. § 1746, I declare under penalty and perjury that the foregoing is correct and true to the best of my knowledge and belief.

| | |
|---|---|
| New York, New York<br>Dated: January 17, 2017 | */s/ Durc Savini*<br>Durc Savini<br>Senior Managing Director<br>Guggenheim Securities, LLC |