# EXHIBIT 1

**Agreement**

*EXECUTION*

**AMENDED AND RESTATED ASSET PURCHASE AGREEMENT**
**dated as of January 31, 2017\*\***

**among**

**LIMITED IP ACQUISITION LLC,**

**as Purchaser**

**and**

**LIMITED STORES, LLC,**
**and**
**THE LIMITED STORES GC, LLC**

**as Sellers**

**\*\* This Agreement has been updated to reflect the result of the Auction that occurred on February 21, 2017**

## Table of Contents

**Page**

**ARTICLE I  DEFINITIONS AND RULES OF CONSTRUCTION**...........................................1

Section 1.1    Definitions ................................................................................1
Section 1.2    Rules of Construction ................................................................7

**ARTICLE II  PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES**......8

Section 2.1    Purchase and Sale of Assets.......................................................8
Section 2.2    Assignment and Assumption of Liabilities...................................8
Section 2.3    Deemed Consents and Cures ......................................................9
Section 2.4    Obligations in Respect of Required Consents ...............................9
Section 2.5    Restrictions in Respect of Customer Lists ....................................9

**ARTICLE III BASIC TRANSACTION**.......................................................................10

Section 3.1    Purchase Price........................................................................10
Section 3.2    Deposit..................................................................................10
Section 3.3    Further Assurances ..................................................................11
Section 3.4    Allocation of Purchase Price ....................................................11

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS** ......................12

Section 4.1    Sellers' Representations and Warranties .....................................12
Section 4.2    Power and Authority; Validity of Agreement................................12
Section 4.3    Organization and Standing.......................................................12
Section 4.4    No Conflicts or Violations.......................................................12
Section 4.5    Title to Assets .......................................................................12
Section 4.6    Intellectual Property................................................................13
Section 4.7    Brokers .................................................................................14
Section 4.8    No Other Representations or Warranties .....................................14

**ARTICLE V  REPRESENTATIONS AND WARRANTIES OF PURCHASER** .................14

Section 5.1    Power and Authority; Validity of Agreement................................14
Section 5.2    Organization...........................................................................15
Section 5.3    No Conflicts or Violations.......................................................15
Section 5.4    Brokers .................................................................................15
Section 5.5    Purchaser's Acknowledgment ...................................................15
Section 5.6    Acquired Assets "AS IS", Purchaser's Acknowledgment Regarding Same .....15
Section 5.7    Financial Capability ................................................................16

**ARTICLE VI COVENANTS OF SELLERS; OTHER AGREEMENTS**................................16

Section 6.1    Consents and Approvals ...........................................................16
Section 6.2    Further Assurances ..................................................................16
Section 6.3    Bankruptcy Actions ................................................................17
Section 6.4    Superior Offers ......................................................................18
Section 6.5    Intellectual Property License ....................................................18

PHIL1 5952492v.3

**ARTICLE VII  COVENANTS OF PURCHASER** ..........................................................**18**

Section 7.1    Further Assurances ............................................................18
Section 7.2    Taxes......................................................................................19
Section 7.3    Adequate Assurance Regarding Assumed Executory Contracts ......................19

**ARTICLE VIII  CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER...19**

Section 8.1    Warranties True as of Both Present Date and Closing Date; Covenants...........19
Section 8.2    Bankruptcy Condition..........................................................19
Section 8.3    No Order ................................................................................19
Section 8.4    Approvals...............................................................................19
Section 8.5    Closing Deliveries.................................................................20

**ARTICLE IX  CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS ..............20**

Section 9.1    Warranties True as of Both Present Date and Closing Date...............................20
Section 9.2    Bankruptcy Court Approval.................................................20
Section 9.3    No Order ................................................................................20
Section 9.4    Consideration ........................................................................20
Section 9.5    Approvals...............................................................................20
Section 9.6    Closing Deliveries.................................................................20

**ARTICLE X  CLOSING** ......................................................................................**20**

Section 10.1    Closing .................................................................................20
Section 10.2    Deliveries by Seller.............................................................21
Section 10.3    Deliveries by Purchaser .....................................................21
Section 10.4    Form of Instruments............................................................21

**ARTICLE XI  TERMINATION** ........................................................................**22**

Section 11.1    Termination..........................................................................22
Section 11.2    Effect of Termination..........................................................23

**ARTICLE XII  ADDITIONAL POST-CLOSING COVENANTS** ...........................**24**

Section 12.1    Tax Matters ..........................................................................24

**ARTICLE XIII  MISCELLANEOUS**.................................................................**24**

Section 13.1    Expenses ..............................................................................24
Section 13.2    Amendment...........................................................................24
Section 13.3    Notices .................................................................................24
Section 13.4    Waivers ................................................................................25
Section 13.5    Electronic Delivery; Counterparts .....................................25
Section 13.6    Headings ..............................................................................25
Section 13.7    SUBMISSION TO JURISDICTION ................................25
Section 13.8    Specific Performance ..........................................................26
Section 13.9    Governing Law ....................................................................26
Section 13.10  Binding Nature; Assignment ...............................................26
Section 13.11  No Third Party Beneficiaries ..............................................26
Section 13.12  Materiality; Disclosure Schedules ......................................26

ii

Section 13.13  Construction......................................................................................27
Section 13.14  Entire Understanding ........................................................................27
Section 13.15  Closing Actions.................................................................................27
Section 13.16  Conflict Between Transaction Documents ........................................28
Section 13.17  No Survival .......................................................................................28

PHIL1 5952492v.3

## AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

THIS AMENDED AND RESTATED ASSET PURCHASE AGREEMENT (as amended, supplemented, amended and restated or otherwise modified from time to time, this "Agreement") is made and entered into as of this 31st day of January, 2017**, by and among (i) Limited IP Acquisition LLC, a Delaware limited liability company ("Purchaser"), and (ii) Limited Stores, LLC, a Delaware limited liability company ("Limited"), and The Limited Stores GC, LLC, an Ohio limited liability company ("Limited GC," and each of Limited and Limited GC, a "Seller," and collectively, the "Sellers"). This Agreement amends, restates and replaces in its entirety that certain Asset Purchase Agreement dated as of January 12, 2017 between Purchaser and the Sellers. **This Agreement has been updated to reflect the result of the Auction that occurred on February 21, 2017**

WHEREAS, Sellers have filed voluntary petitions under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on January 17, 2017 (the date of the commencement of such filing, the "Petition Date");

WHEREAS, the parties to this Agreement intend to effectuate the transactions contemplated by this Agreement through a sale pursuant to Section 363 of the Bankruptcy Code; and

WHEREAS, the execution and delivery of this Agreement and Sellers' ability to consummate the transactions set forth below are subject, *inter alia*, to entry of an order of the Bankruptcy Court approving this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, agreements, representations and warranties contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND RULES OF CONSTRUCTION

**Section 1.1    Definitions**. Unless otherwise defined herein, terms used herein shall have the meanings set forth below:

"Acquired Assets" has the meaning set forth in Section 2.1(a) hereof.

"Acquired Intellectual Property" has the meaning set forth in Section 2.1(a) hereof.

"Added Assumed Executory Contracts" has the meaning set forth in Section 2.2(a) hereof.

"Additional Deposit" has the meaning set forth in Section 3.2(a) hereof.

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession,

directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities or otherwise.

"Agreement" means this Asset Purchase Agreement, including all the Exhibits and the Schedules hereto, as the same may be amended, supplemented, amended and restated, or otherwise modified from time to time in accordance with its terms.

"Allocation" has the meaning set forth in Section 3.4 hereof.

"Alternative Transaction" means a sale, transfer or other disposition, directly or indirectly, whether by means of an asset sale, merger, sale of stock, or otherwise, and including a plan of reorganization approved by the Bankruptcy Court, of any material portion of the Acquired Assets to a party other than Purchaser, whether in a single transaction or a series of transactions.

"Asset Acquisition Statement" has the meaning set forth in Section 3.4 hereof.

"Assignment and Assumption" has the meaning set forth in Section 10.2(d) hereof.

"Assumed Executory Contract" has the meaning set forth in Section 2.1(a) hereof.

"Assumed Obligations" has the meaning set forth in Section 2.2(a) hereof.

"Avoidance Actions" means any and all avoidance, recovery, or subordination actions or remedies that may be brought by or on behalf of either Seller or its chapter 11 estate, including causes of action arising under chapter 5 of the Bankruptcy Code or applicable non-bankruptcy law.

"Bankruptcy Code" has the meaning set forth in the Recitals hereto.

"Bankruptcy Court" has the meaning set forth in the Recitals hereto.

"Bankruptcy Rule" or "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

"Books and Records" means all (i) books and records of Sellers pertaining to the Acquired Assets, (ii) all records relating to customers, suppliers or personnel of Sellers pertaining to the Acquired Assets, (iii) all records relating to all product, business and marketing plans of any Seller pertaining to the Acquired Assets, and (iv) all books, ledgers, files, reports, plans, drawings, and operating records of Sellers pertaining to the Acquired Assets; provided, however, "Books and Records" shall not include the originals of any Sellers' minute books, stock books, and Tax Returns.

"Business" means the activities carried on by Sellers relating to the operation of a fashion specialty retailer of high-quality, private-label apparel, and accessories.

"Business Day" means each day other than a Saturday, a Sunday, or a day on which banking institutions are not required to be open in the State of Delaware.

"Cash Portion" has the meaning set forth in Section 3.1(a) hereof.

"Chapter 11 Cases" means the cases commenced by Sellers under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Claim" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 10.1 hereof.

"Closing Date" has the meaning set forth in Section 10.1 hereof.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Contract" means any agreement, contract, commitment, or other binding arrangement or understanding, whether written or oral, to which any Seller is a party and which such Seller is permitted to assign under the Bankruptcy Code and Purchaser to assume.

"Copyright" means all U.S. and foreign copyrights and copyrightable subject matter, whether registered or unregistered, including all U.S. copyright registrations and applications for registration and foreign equivalents, all moral rights, all common-law copyright rights and all rights to register and obtain renewals and extensions of copyright registrations, together with all copyright rights accruing by reason of any international copyright convention.

"Cure Cap" means Cure Costs associated with the Assumed Executory Contracts in an amount not to exceed 105% of the Cure Costs designated in the Bankruptcy Court filings to be made by the Sellers pursuant to Section 6.3(a)(ii) hereof.

"Cure Costs" means all cure costs associated with any Assumed Executory Contract that is subject to a cure pursuant to section 365 of the Bankruptcy Code.

"Customer Lists" means any and all lists of current and past customers, including any and all information relating in any way to the use of such lists, including (x) Personal Information and (y) customer purchase history at a transaction level (including with respect to dollar amounts, dates, and items purchased), but excluding from the foregoing any credit card numbers or other information to the extent prohibited by any Data Security Requirements.

"Data Security Requirements" means, collectively, all of the following to the extent relating to privacy, security, or security breach notification requirements: (i) each Seller's own rules, policies, and procedures; (ii) all applicable Regulations; (iii) industry standards applicable to the industry in which the Business is conducted (including the Payment Card Industry Data Security Standard (PCI DSS)); and (iv) Contracts into which either Seller has entered or by which it is otherwise bound.

"Deposit" has the meaning set forth in Section 3.2(a) hereof.

"DIP Credit Agreement" means any debtor-in-possession credit agreement(s), if any, entered into by the Sellers authorized by any Order of the Bankruptcy Court.

3

"Disclosure Schedules" has the meaning set forth in <u>Section 4.1</u> hereof.

"Dollars" or "$" means dollars of the United States of America.

"Domain Names" means any alphanumeric designation registered with or assigned by a domain name register, registry or domain name registration authority as part of an electronic address on the Internet. For clarity, a Domain Name may also embody a Trademark.

"Electronic Delivery" has the meaning set forth in <u>Section 13.5</u> hereof.

"Escrow Agent" means Citibank, N.A., or its successors, in its capacity as such pursuant to the Escrow Agreement.

"Escrow Agreement" has the meaning set forth in <u>Section 3.2(a)</u> hereof.

"Exhibits" means the exhibits hereto.

"Final Order" means an Order of the Bankruptcy Court or any other court of competent jurisdiction which has not been modified, amended, reversed, vacated or stayed and as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending or, if an appeal, motion or petition is pending, for which Order no stay shall have been entered by the Bankruptcy Court or such other court of competent jurisdiction; <u>provided</u>, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or any comparable rule of the Bankruptcy Rules may be filed related to such Order shall not cause an Order not be a Final Order.

"GAAP" means, at a given time, United States generally accepted accounting principles, consistently applied.

"Governmental Authority" means any United States federal, state or local or any foreign government, governmental regulatory or administrative authority, agency or commission or any court, tribunal or judicial or arbitral body, including the Bankruptcy Court.

"Intellectual Property" means any and all worldwide rights in and to all intellectual property (whether arising under statutory or common law, contract, or otherwise), which includes all of the following: (a) inventions, discoveries, processes, designs, techniques, developments and related improvements whether or not patentable; (b) Patents; (c) Trademarks, trade dress, trade names, Domain Names, corporate names, fictitious names, translations of any of the foregoing and any foreign or international equivalent of any of the foregoing and all goodwill associated therewith and any applications and/or registrations in connection with the foregoing; (d) Trade Secrets; (e) Customer Lists; (f) rights associated with works of authorship, including Copyrights, design rights, rights in databases, and website and social media site content; and (g) social media accounts.

"Initial Deposit" has the meaning set forth in <u>Section 3.2(a)</u> hereof.

"Inventory" means all inventory of any kind or nature, whether or not prepaid, and wherever located, held, or owned by any Seller as the same exists on the Closing Date.

4

"Knowledge of Sellers" means the actual knowledge, information and belief of the Sellers' senior executive officers, without inquiry, in their respective capacity as senior executive officers of the Sellers only and not in their personal capacity or in any other capacity, and without personal liability, as of the date of this Agreement.

"License" shall have the meaning set forth in Section 4.6(b) hereof.

"Lien" or "Liens" means any lien (statutory or otherwise), hypothecation, encumbrance, Claim, liability, security interest, interest, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, Tax, or Order of any Governmental Authority.

"Limited" has the meaning set forth in the Preamble hereto.

"Limited GC" has the meaning set forth in the Preamble hereto.

"Names" means "The Limited" and "Limited Stores" with and without design, and any variations of the foregoing, including any similar trade names, symbols, trademarks, service marks, and logos used or available for use by either Seller or any of their Affiliates engaged in the conduct of the Business.

"Order" means any decree, order, injunction, rule, judgment, or consent of or by any Governmental Authority.

"Patents" means U.S. and foreign patents, patent applications, provisional applications and patents issuing therefrom, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals, patent disclosures, inventions, or improvements thereto and any foreign or international equivalent of any of the foregoing.

"Permits" means licenses, permits, approvals, certificates of occupancy, authorizations, operating permits, registrations, plans, and the like.

"Permitted Liens" means (i) statutory liens for current property Taxes and assessments not yet due and payable, including liens for *ad valorem* Taxes and statutory liens not yet due and payable, and (ii) licenses of or other contractual rights with respect to Intellectual Property.

"Person" means any corporation, partnership, joint venture, limited liability company, organization, entity, authority, or natural person.

"Personal Information" means a natural Person's name, street address, telephone number, e-mail address, social security number, driver's license number, passport number, credit card number, or user or account number, or any other piece of information that, individually or when combined with other information, allows the identification of a natural Person or is otherwise considered personally identifiable information or personal data protected under any applicable Regulation.

"Petition Date" has the meaning set forth in the Recitals hereto.

"Prepetition Loan Documents" means the "Loan Documents" as defined in that certain Term Loan Agreement, dated as of December 20, 2011, between Limited Stores, LLC, as the lead borrower for the borrowers named therein, the Facility Guarantors (as defined therein), Cerberus Business Finance, LLC, as administrative agent and collateral agent, and the lenders from time to time named therein (as amended, restated, supplemented, or otherwise modified from time to time prior to the Petition Date).

"Proposed Allocation" has the meaning set forth in Section 3.4 hereof.

"Purchase Price" has the meaning set forth in Section 3.1(a) hereof.

"Purchaser" has the meaning set forth in the Preamble hereto.

"Regulation" means any law, statute, regulation, ruling, or Order of, administered or enforced by or on behalf of, any Governmental Authority.

"Revised Statement" has the meaning set forth in Section 3.4 hereof.

"Sale Hearing" means the hearing of the Bankruptcy Court to approve this Agreement and the transactions contemplated herein, as the same may be continued from time to time.

"Sale Motion" has the meaning set forth in Section 6.3(a) hereof.

"Sale Order" means the order of the Bankruptcy Court, in form and substance reasonably acceptable to Purchaser and Sellers, to be entered by the Bankruptcy Court pursuant to Sections 363 and 365 of the Bankruptcy Code and providing for, among other things, the application of the proceeds of the Cash Portion of the Purchase Price in accordance with any Order of the Bankruptcy Court in effect authorizing the Sellers' entry into any DIP Credit Agreement.

"Schedules" means the schedules attached hereto (including, without limitation, the Disclosure Schedules).

"Seller" or "Sellers" has the meaning set forth in the Preamble hereto.

"Tax" means all federal, state, local, county, foreign, and other taxes, assessments, or other government charges, including any interest, penalties, or additions to Tax or additional amounts in respect of the foregoing.

"Tax Return" means any report, return, declaration, claim for refund relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"Taxable Consideration" has the meaning set forth in Section 3.4 hereof.

"Trade Secrets" means trade secrets and other confidential or proprietary information, including confidential or proprietary methods, processes, practices, formulas, designs, assembly procedures, and specifications.

6

"Trademark" means U.S. and foreign trademarks, service marks, designs, logos, brand names, product names, slogans, and other indicia of source, including U.S. and foreign trademark registrations and applications for registration, and foreign equivalents, all common law rights therein, and all rights to register and obtain renewals and extensions of trademark registrations, together with all trademark rights accruing by reason of any international trademark treaty.

"Transaction Documents" means this Agreement and all other agreements, instruments, certificates, and other documents to be entered into or delivered by any party in connection with the transactions contemplated to be consummated pursuant to this Agreement.

Section 1.2    **Rules of Construction**. Unless the context otherwise clearly indicates, in this Agreement:

(a)    accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP. To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control;

(b)    "hereof," "herein," and "hereunder" and terms of similar import are references to this Agreement as a whole and not to any particular provision of this Agreement;

(c)    "including" has the inclusive meaning frequently identified with the phrase "but not limited to" or "without limitation";

(d)    "may not" is prohibitive and not permissive;

(e)    "or" is used in the inclusive sense of "or";

(f)    the singular includes the plural;

(g)    references herein to a specific section, subsection, clause, recital, schedule or exhibit shall refer, respectively, to sections, subsections, clauses, recitals, schedules or exhibits of this Agreement, unless otherwise specified;

(h)    "dollars" or "$" mean dollars in the lawful currency of the United States of America and all payments made pursuant to this Agreement shall be in United States dollars;

(i)    references to any period of days shall be deemed to be the relevant number of calendar days, unless otherwise specified;

(j)    if the last day for the giving of any notice or the performance of any act required or permitted under this Agreement is a day that is not a Business Day, then the time for the giving of such notice or the performance of such action shall be extended to the next succeeding Business Day;

7

(k)    with respect to the determination of any period of time, the word "from" or "since" means "from and including" or "since and including," as applicable, and the words "to" and "until" each means "to and including"; and

(l)    references herein to any gender shall include each other gender.

## ARTICLE II
## PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES

### Section 2.1    Purchase and Sale of Assets.

(a)    Subject to the terms and conditions set forth in this Agreement (including the entry of the Sale Order), at the Closing, each Seller shall sell, contribute, convey, assign, transfer and deliver to Purchaser, free and clear of all Liens (except for the Assumed Obligations and Permitted Liens), and Purchaser shall purchase, acquire and take assignment and delivery of, for the consideration specified in Section 3.1, all of Sellers' properties, assets, rights, titles and interests in, to, and under (i) all Intellectual Property of any Seller (excluding any licenses of commercially available software), including the Names and each Seller's Intellectual Property listed on Schedule 2.1(a)(i) attached hereto (the "Acquired Intellectual Property"), including all rights and remedies related thereto (including the right to sue for past, present, or future infringement, misappropriation, dilution or other violation relating to any of the foregoing and other remedies against infringement of any of the foregoing, and rights to protection of interests of the foregoing under all Regulations); (ii) all of Sellers' rights existing under the Contracts listed on Schedule 2.1(a)(ii) attached hereto and all of Sellers' rights existing under the Added Assumed Executory Contracts (collectively, the "Assumed Executory Contracts"); and (iii) Sellers' other assets listed on Schedule 2.1(a)(iii) attached hereto (the assets described in the preceding clauses (i) through (iii), including those listed on Schedule 2(a)(i), Schedule 2.1(a)(ii), and Schedule 2.1 (a)(iii), and subject to Section 2.5, collectively, the "Acquired Assets").

(b)    All of the Acquired Assets shall be sold, assigned, transferred, conveyed, and delivered to Purchaser free and clear of all Liens (other than Permitted Liens), whether arising prior to or subsequent to the Petition Date.

(c)    Sellers' properties, assets, rights, titles and interests that are not Acquired Assets shall be retained by Sellers and are not being sold or assigned to Purchaser hereunder.

### Section 2.2    Assignment and Assumption of Liabilities.

(a)    Subject to the terms and conditions set forth in this Agreement, at the Closing, Purchaser shall assume and agree to discharge when due in accordance with their respective terms and subject to the respective conditions thereof the obligations under the Assumed Executory Contracts (including Cure Costs) (collectively, the "Assumed Obligations"); provided that Purchaser shall have right, by written notice delivered to Sellers at any time during the period from and after the date hereof and until the Closing Date, to add or delete any Contract from Schedule 2.1(a)(ii), it being understood that (i) any such Contract deleted by Purchaser from such Schedule 2.1(a)(ii) may subsequently be rejected by Sellers in the Chapter 11 Cases, (ii) any such deleted Contract shall cease to be an Assumed Executory Contract and

8

Purchaser shall have no obligation to pay any Cure Costs with respect thereto, and (iii) any such Contract added by Purchaser to such Schedule 2.1(a)(ii) (each such added Contract, an "Added Assumed Executory Contract") shall be an Assumed Executory Contract and Purchaser shall pay any Cure Costs with respect thereto; provided further, that prior to rejecting any Contract that is not then on Schedule 2.1(a)(ii), Sellers shall provide Purchaser no less than five (5) Business Days' notice of their intent to reject any such Contract to provide Purchaser with an opportunity to add such Contract to Schedule 2.1(a)(ii) if Purchaser so desires. Notwithstanding anything in this Agreement to the contrary, no additions to Schedule 2.1(a)(ii) pursuant to this Section 2.2 shall be deemed to modify any representations or warranties or any covenants of any Seller for purposes of determining whether or not the conditions to Closing set forth in ARTICLE IX have been satisfied.

(b)     Notwithstanding anything in this Agreement to the contrary, Sellers hereby acknowledge and agree that Purchaser is not assuming from Sellers, or is in any way responsible for, any other obligations, Claims, or liabilities of Sellers that are not Assumed Obligations.

Section 2.3    **Deemed Consents and Cures**. For all purposes of this Agreement (including all representations and warranties of Sellers contained herein), Sellers shall be deemed to have obtained all required consents in respect of the assignment of any Assumed Executory Contract if, and to the extent that, pursuant to the Sale Order or other Bankruptcy Court Order, Sellers are authorized to assume and assign to Purchaser the Assumed Executory Contracts pursuant to section 365 of the Bankruptcy Code and any applicable Cure Cost has been satisfied by Purchaser on behalf of Sellers, as provided herein.

Section 2.4    **Obligations in Respect of Required Consents**. To the extent any Assumed Executory Contract requires the payment of Cure Costs in order to be assumed pursuant to section 365 of the Bankruptcy Code, at the Closing (or as soon as reasonably practicable thereafter) the Cure Costs related to such Assumed Executory Contract shall be paid by Purchaser (after giving effect to the consummation of the transactions contemplated hereby); provided, however, that with respect to any Cure Costs that are not finally determined as of the Closing in accordance with the Sale Order, by Bankruptcy Court Order or by the agreement of Purchaser and the counterparty to the applicable Contract, such Cure Costs shall be paid by Purchaser as such Cure Costs become finally established in accordance with the Sale Order, by Final Order or by agreement of Purchaser and the counterparty to such Contract. Each Seller agrees that it will promptly take such actions as are reasonably necessary or desirable to obtain a Final Order of the Bankruptcy Court providing for the assumption by such Seller of the Assumed Executory Contracts of such Seller and the assignment to Purchaser of such Assumed Executory Contracts.

Section 2.5    **Restrictions in Respect of Customer Lists**. To the extent that the transfer and assignment of any Acquired Assets that constitute Customer Lists (or any Personal Information contained therein) would result in the violation, breach or default under any Data Security Requirements, such Customer Lists (or Personal Information contained therein) shall be deemed excluded from the Acquired Assets, and not transferred or assigned under this Agreement, until such time, if any, as actions can be taken to prevent such violation, breach or default.

9

## ARTICLE III
## BASIC TRANSACTION

**Section 3.1    Purchase Price**.

(a)    The aggregate purchase price for the Acquired Assets (the "Purchase Price") shall be (i) an amount in cash equal to $26,750,000 (the "Cash Portion"), and (ii) the assumption of the Assumed Obligations.

(b)    At the Closing:

(i)    Purchaser shall be assigned the Acquired Assets and Assumed Obligations and shall pay the Cash Portion by directing the Escrow Agent to deliver the Deposit to Sellers.

(ii)    Purchaser shall pay the aggregate amount of Cure Costs associated with the Assumed Executory Contracts in accordance with Section 2.4.

(c)    Payments made pursuant to this Section 3.1 shall be allocated among the assets purchased in accordance with Section 12.1.

**Section 3.2    Deposit**.

(a)    Prior to the date hereof, Purchaser, the Sellers, and the Escrow Agent have entered into an escrow agreement (the "Escrow Agreement"), and in accordance therewith, Purchaser has previously deposited the sum of $1,287,500 in cash with the Escrow Agent into an account designated by the Escrow Agent (the "Initial Deposit"). On Tuesday, January 31, 2017, Purchaser shall deposit the additional sum of $24,962,500 in cash with the Escrow Agent into an account designated by the Escrow Agent (the "Additional Deposit", and together with the Initial Deposit, referred to herein as the "Deposit"). The Deposit shall be released and delivered (together with all accrued investment income thereon) by the Escrow Agent to either Purchaser or the Sellers, as applicable, as follows, in each case in accordance with the Escrow Agreement:

(i)    if the Closing shall occur, the Deposit shall be paid by the Escrow Agent to the Sellers and applied towards the Purchase Price payable by Purchaser to the Sellers under Section 3.1(a) and all accrued investment income thereon shall be delivered to Purchaser at the Closing;

(ii)    if this Agreement is terminated by Sellers pursuant to Section 11.1(d), the Deposit, together with all accrued investment income thereon, shall be released to Sellers within five (5) Business Days of such termination;

(iii)    if this Agreement is terminated for any reason (other than a termination by Sellers pursuant to Section 11.1(d)), the Deposit, together with all accrued investment income thereon, shall be returned to the Purchaser within five (5) Business Days of such termination.

10

(b)    The Deposit shall form no part of the Sellers' Chapter 11 estate under Section 541(a) of the Bankruptcy Code or otherwise, and the Sellers shall claim no right, title or interest in the Deposit other than as set forth herein.

Section 3.3    **Further Assurances**. From time to time after the Closing and without further consideration, (i) Sellers, upon the request of Purchaser, shall execute and deliver such documents and instruments of conveyance and transfer as Purchaser may reasonably request in order to consummate the purchase and sale of the Acquired Assets as contemplated hereby, and (ii) Purchaser, upon the request of Sellers, shall execute and deliver such documents and instruments of contract assumption as Sellers may reasonably request in order to confirm Purchaser's liability for the obligations specifically assumed hereunder. From and for ninety (90) days after the Closing and without further consideration, Sellers, upon the written request of Purchaser, shall cause the respective employees and representatives of Sellers, to the extent such employees and representatives are still employed or retained by Sellers after the Closing, to cooperate with all reasonable requests of Purchaser to effectively transfer all and any portion of the Acquired Assets to Purchaser (e.g., transferring data files and other information technology files). For clarity, Sellers shall not be responsible for any costs or expenses (including filing fees and attorneys' or other professional fees) associated with recording or perfecting the transfer and assignment of the Acquired Intellectual Property from Sellers to Purchaser.

Section 3.4    **Allocation of Purchase Price**. Within thirty (30) days after the Closing Date, Purchaser shall prepare and deliver to Sellers an allocation of the Purchase Price, the Assumed Obligations, and any other items that are treated as additional purchase price for income Tax purposes (the "Taxable Consideration") among the Acquired Assets in accordance with Section 1060 of the Code (the "Proposed Allocation"). Sellers shall have thirty (30) days after receipt of the Proposed Allocation to notify Purchaser in writing of any items of the Proposed Allocation that are not reasonable in Sellers' view. If Sellers do not object in writing during such thirty (30) day period, then the Proposed Allocation shall be final and binding on all parties. If Sellers object in writing during such thirty (30) day period, then the parties hereto shall cooperate in good faith to reach a mutually agreeable allocation of the Taxable Consideration, which allocation shall be binding on all parties. If the parties hereto are unable to reach an agreement within sixty (60) days of Sellers' receipt of the Proposed Allocation, then any disputed items shall be disposed of by the Bankruptcy Court, unless otherwise agreed to by Purchaser and Sellers. The final allocation as determined pursuant to this Section 3.4 shall be referred to as the "Allocation." In accordance with such binding allocation, Purchaser shall prepare and deliver to Sellers copies of Form 8594 and any required exhibits thereto (the "Asset Acquisition Statement"). Purchaser shall prepare and deliver to Sellers (or their designated successors) from time to time revised copies of the Asset Acquisition Statement (the "Revised Statements") so as to report any matters on the Asset Acquisition Statement that need updating, consistent with the agreed upon allocation. The parties hereto shall, and shall cause their respective controlled Affiliates to, use the allocations set forth in the Asset Acquisition Statement or, if applicable, the last Revised Statement, for all Tax purposes and to file all Tax Returns in a manner consistent with such allocation statement and take no position contrary thereto, in each case, unless required to do so by applicable Tax laws or good faith resolution of a Tax contest. For the avoidance of doubt, the foregoing Allocation shall not preclude nor shall be deemed to preclude the Sellers from utilizing a different allocation of sale proceeds for non-Tax purposes in connection with one or more chapter 11 plans filed in the Chapter 11 Cases.

11

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF SELLERS

**Section 4.1    Sellers' Representations and Warranties**. Sellers jointly and severally represent and warrant to Purchaser that the statements contained in this ARTICLE IV are correct and complete as of the date of this Agreement, except as expressly set forth in the disclosure schedules delivered by Sellers to Purchaser on the date hereof (the "Disclosure Schedules"). The information disclosed in any numbered part is intended to relate to and to qualify the particular representation or warranty set forth in the corresponding numbered section in this Agreement; provided, that any event, fact or circumstance disclosed in the Disclosure Schedules shall be deemed to be a disclosure for each other section of this Agreement to the extent it is reasonably apparent from the face of such disclosure that it would also qualify such other section.

**Section 4.2    Power and Authority; Validity of Agreement**. Subject to entry of the Sale Order, each Seller has full power and authority to execute and deliver the Transaction Documents to which it is a party and to consummate the transactions contemplated thereby. No other corporate or organizational proceedings on the part of any Seller is necessary to approve and authorize the execution and delivery of the Transaction Documents to which such Seller is a party and the consummation of the transactions contemplated thereby. All Transaction Documents to which any Seller is a party have been duly executed and delivered by such Seller, except such Transaction Documents that are required by the terms hereof to be executed and delivered by such Seller after the date hereof, in which case such Transaction Documents will be duly executed and delivered by such Seller at or prior to the Closing, and, subject to any necessary authorization from the Bankruptcy Court and to the due authorization, execution and delivery of such Transaction Documents by the other parties thereto, all such Transaction Documents constitute, or will constitute, as the case may be, the valid and binding agreements of such Seller, enforceable against such Seller in accordance with their terms.

**Section 4.3    Organization and Standing**. Each Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the state of its formation and, except where the failure to obtain such qualification would not reasonably be expected to have a material adverse effect, is qualified to do business in every jurisdiction in which it is required to be qualified.

**Section 4.4    No Conflicts or Violations**. Subject to any necessary authorization of the Bankruptcy Court, except as set forth on Schedule 4.4 attached hereto, and to the extent any of the foregoing is not enforceable due to operation of the Sale Order, the execution, delivery and performance of the Transaction Documents to which any Seller is a party and the consummation of the transactions contemplated thereby by such Seller do not and shall not (i) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any Governmental Authority or (ii) (A) conflict with or result in any breach of any of the terms, conditions or provisions of, (B) constitute a default under, or (C) result in a violation of the provisions of the articles of formation, the limited liability company agreement, or other constitutive documents of Sellers.

**Section 4.5    Title to Assets**.

12

(a)     Except as set forth on Schedule 4.5(a) attached hereto, Sellers have title to the Acquired Assets.

(b)     Subject to entry of the Sale Order, Sellers have the power and the right to sell, assign and transfer, and Sellers will sell and deliver to Purchaser, and upon consummation of the transactions contemplated by this Agreement, Purchaser will acquire title to the Acquired Assets, free and clear of all Liens other than Permitted Liens.

(c)     This Agreement and the other Transaction Documents contemplated hereby, when duly executed and delivered by each Seller to Purchaser in accordance with and as approved by the Sale Order, will effectively vest in Purchaser title to the Acquired Assets, subject only to the Assumed Obligations and Permitted Liens.

**Section 4.6     Intellectual Property**.

(a)     Schedule 4.6(a) sets forth a true, correct and complete list of all U.S. and foreign (i) issued Patents and pending applications for Patents; (ii) registered Trademarks and pending applications for Trademarks; (iii) registered Copyrights and pending applications for Copyrights; (iv) Domain Names, (v) social media accounts, in each case which is owned by, or registered to, a Seller. Except as set forth on Schedule 4.6(a), Sellers are the sole record owners (or registered users, as applicable) of all of the material Intellectual Property set forth on Schedule 4.6(a) that constitutes Acquired Intellectual Property and all such Intellectual Property is subsisting and, to the Knowledge of Sellers, valid and enforceable.

(b)     Schedule 4.6(b) sets forth a true, correct, and complete list of all material licenses, sublicenses or other Contracts to which a Seller is a party or otherwise bound pursuant to which a Seller has been granted or has obtained any license to use any Intellectual Property (other than Contracts granting rights to use commercially available software with a total replacement cost of less than $250,000) (each, a "License"). Except as otherwise disclosed on Schedule 4.6(b), each License that constitutes an Acquired Asset is in full force and effect and is a valid and binding obligation of the Seller party thereto, and to the Knowledge of Sellers, the other parties thereto, in accordance with its terms and conditions, except as enforceability may be limited by bankruptcy, insolvency or other similar laws affecting the enforcement of creditors' rights generally. Upon entry of the Sale Order and payment of the Cure Costs, to the Knowledge of Sellers, (A) no Seller will be in breach or default of its obligations under any License, (B) no condition exists that with notice or lapse of time or both would constitute a default by a Seller under any of the Licenses, and (C) to the Knowledge of Sellers, no other party to any of the Licenses is in breach or default thereunder, except in the cases of clauses (A), (B), and (C) for any breaches or defaults that would not reasonably be expected to have a material adverse effect.

(c)     Except as disclosed on Schedule 4.6(c), (i) there are no material actions, suits, complaints, charges, proceedings, Orders, investigations, or Claims pending, or to the Knowledge of Sellers, threatened in writing against any Seller, alleging that the conduct of the Business by Sellers as currently conducted with respect to the Acquired Intellectual Property infringes or misappropriates, dilutes or otherwise violates any Person's Intellectual Property, (ii) to the Knowledge of Sellers, the conduct of the Business by Sellers as currently conducted with respect to Acquired Intellectual Property does not materially infringe or misappropriate,

13

dilute or otherwise violate any Person's Intellectual Property, and (iii) to the Knowledge of Sellers, no Person is materially infringing, misappropriating, diluting or otherwise violating any Intellectual Property owned by any Seller.

**Section 4.7**    **Brokers**. Except as set forth on <u>Schedule 4.7</u> attached hereto, no Seller has incurred any liability to any broker, finder or agent with respect to the payment of any commission regarding the consummation of the transactions contemplated hereby and in the other Transaction Documents.

**Section 4.8**    **No Other Representations or Warranties**.

(a)    Except for the representations and warranties contained in this <u>ARTICLE IV</u>, Purchaser acknowledges and agrees that no Seller nor any other Person on behalf of any Seller (including Sellers) makes any other express or implied representation or warranty with respect to Sellers (including representations and warranties as to the condition of the Acquired Assets or the Business) with respect to any other information provided to Purchaser. No Seller nor any other Person will have or be subject to any liability or indemnification obligation to Purchaser or any other Person resulting from the distribution to Purchaser, or use by Purchaser of, any such information, including any information, documents, projections, forecasts or other material made available to Purchaser in certain "data rooms", confidential information memoranda or management presentations in expectation of the transactions contemplated by this Agreement.

(b)    In connection with investigation by Purchaser, Purchaser has received or may receive from Sellers or Persons on behalf of Sellers (including Sellers and Sellers' other representatives) certain projections, forward-looking statements and other forecasts and certain business plan information. Purchaser acknowledges and agrees that (i) there are uncertainties inherent in attempting to make such estimates, projections and other forecasts and plans, (ii) Purchaser is familiar with such uncertainties, (iii) Purchaser is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections and other forecasts and plans so furnished to it (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans), and (iv) that Purchaser shall have no claim against anyone (including Sellers) with respect thereto. Accordingly, Purchaser acknowledges and agrees that no Seller and no Person on behalf of Sellers (including Sellers) makes any representation or warranty with respect to such estimates, projections, forecasts or plans (including the reasonableness of the assumptions underlying such estimates, projections, forecasts or plans).

**ARTICLE V**
**REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser represents and warrants to Sellers as follows as of the date of this Agreement:

**Section 5.1**    **Power and Authority; Validity of Agreement**. Purchaser has full power and authority to execute and deliver the Transaction Documents to which it is a party and to consummate the transactions contemplated thereby. No other corporate or organizational proceedings on the part of Purchaser are necessary to approve and authorize the execution and

14

delivery of the Transaction Documents to which Purchaser is a party and the consummation of the transactions contemplated thereby. All Transaction Documents to which Purchaser is a party have been duly executed and delivered by Purchaser, except such Transaction Documents that are required by the terms hereof to be executed and delivered by Purchaser after the date hereof, in which case such Transaction Documents will be duly executed and delivered by Purchaser at or prior to the Closing, and, subject to any necessary authorization from the Bankruptcy Court and to the due authorization, execution and delivery of such Transaction Documents by the other parties thereto, all such Transaction Documents constitute, or will constitute, as the case may be, the valid and binding agreements of Purchaser, enforceable against Purchaser in accordance with their terms.

   **Section 5.2    Organization.** Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

   **Section 5.3    No Conflicts or Violations.** Subject to any necessary authorization of the Bankruptcy Court, the execution, delivery and performance of the Transaction Documents to which Purchaser is a party and the consummation of the transactions contemplated thereby by Purchaser do not and shall not (i) require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any Governmental Authority or (ii) (A) conflict with or result in any breach of any of the terms, conditions or provisions of, (B) constitute a default under or (C) result in a violation of (1) the provisions of the articles of incorporation, by-laws, or other constitutive documents of Purchaser or (2) any material indenture, mortgage, lease, loan agreement or other material agreement or instrument to which Purchaser is bound or affected or any law, statute, rule, Regulation or Order to which Purchaser is subject, except in clause (2), as would not reasonably be expected to have a material adverse effect.

   **Section 5.4    Brokers.** Purchaser has incurred no liability to any broker, finder or agent with respect to the payment of any commission regarding the consummation of the transactions contemplated hereby and in the other Transaction Documents.

   **Section 5.5    Purchaser's Acknowledgment.** Purchaser is not aware of any facts or circumstances, which (with or without notice or lapse of time or both) would cause any representations or warranties of any Seller to be untrue or incorrect in any respect.

   **Section 5.6    Acquired Assets "AS IS", Purchaser's Acknowledgment Regarding Same.** Purchaser agrees, warrants and represents that, except as set forth in this Agreement, (i) Purchaser is purchasing the Acquired Assets on an "AS IS" and "WITH ALL FAULTS" basis based solely on Purchaser's own investigation of the Acquired Assets, and (ii) neither Sellers, nor any broker, agent, officer, employee, servant, attorney or representative of Sellers has made any warranties, representations or guarantees, express, implied or statutory, written or oral, respecting the Acquired Assets or the Business or any part of the Acquired Assets or the Business relating to the financial performance of the Acquired Assets, the Business, or the physical condition of the Acquired Assets. Purchaser further acknowledges and agrees that the Purchase Price has been agreed upon by Sellers and Purchaser after good-faith, arms-length negotiation in light of Purchaser's agreement to purchase the Acquired Assets "AS IS" and "WITH ALL FAULTS". Purchaser agrees, warrants, and represents that, except as set forth in

15

this Agreement, Purchaser has relied, and shall rely, solely upon Purchaser's own investigation of all such matters and that Purchaser assume all risks with respect thereto. EXCEPT AS SET FORTH IN THIS AGREEMENT, NO PERSON ON BEHALF OF ANY SELLER (INCLUDING SELLERS) MAKES ANY EXPRESS WARRANTY, WARRANTY OF MERCHANTABILITY, WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE OR ANY IMPLIED OR STATUTORY WARRANTY WHATSOEVER WITH RESPECT TO ANY REAL OR PERSONAL PROPERTY, ANY FIXTURES OR THE ACQUIRED ASSETS OR THE BUSINESS.

**Section 5.7    Financial Capability**. Purchaser (i) has as of the date of this Agreement, and will have at Closing, sufficient funds or financing available to pay the Cash Portion of the Purchase Price and any expenses incurred by Purchaser in connection with the transactions contemplated by this Agreement and the Transaction Documents, (ii) has as of the date of this Agreement, and will have at Closing, the resources and capabilities (financial or otherwise) to perform Purchaser's obligations hereunder, and (iii) has not incurred any obligation, commitment, restriction, or liability of any kind, that would impair or adversely affect such resources and capabilities.

## ARTICLE VI
## COVENANTS OF SELLERS; OTHER AGREEMENTS

**Section 6.1    Consents and Approvals**. Each of the parties shall use commercially reasonable efforts to obtain any authorizations, consents and approvals of any Governmental Authority in connection with the matters contemplated by this Agreement and the other Transaction Documents. From the date of this Agreement until the Closing or earlier termination of this Agreement, each Seller shall provide, and shall cause its employees and representatives to provide, during regular business hours and upon reasonable notice (to the extent such employees and representatives are still employed or retained by Sellers at such time), all reasonable cooperation in connection with the following, to the extent and only to the extent related to the Acquired Assets and the consummation of the transactions contemplated hereby: (i) knowledge transfer from the employees and representatives of the Sellers to Purchaser and its employees and representatives that is reasonably requested to expedite and implement the successful transfer of the Acquired Assets, (ii) providing copies of documentation such as training manuals, and procedures, needed to use or exploit the Acquired Assets; and (iii) coordinating with Purchaser's selected vendors to communicate any information that is required by such vendors to support any necessary requirements for new systems to operate the Acquired Assets after the Closing. For clarity, Sellers shall not be responsible for any costs or expenses (including filing fees and attorneys' or other professional fees) associated with recording or perfecting the transfer and assignment of the Acquired Intellectual Property from Sellers to Purchaser.

**Section 6.2    Further Assurances**.

(a)    Sellers will use commercially reasonable efforts to obtain the entry of the Sale Order on the Bankruptcy Court's docket as soon as practicable and will use their commercially reasonable efforts to timely obtain any other consent required for the consummation of the transactions contemplated by this Agreement as soon as practicable.

16

(b)     Sellers shall execute such documents and use commercially reasonable efforts to take or cause to be taken all action and do or cause to be done all things necessary or proper to consummate the transactions contemplated by this Agreement. Sellers shall use commercially reasonable efforts to fulfill or obtain the fulfillment of the conditions set forth in ARTICLE VIII of this Agreement.

(c)     Without the prior written consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), from the date hereof until the Closing or earlier termination of this Agreement, neither Seller shall (i) sell, assign, transfer, convey, pledge, mortgage, lease, license, or otherwise dispose of or encumber any of the Acquired Assets, or any interests therein (other than the abandonment of trademark registrations or applications for registration due to non-use or that are identified on Schedule 4.6(a) as not being renewed by Sellers); (ii) grant any licenses or other rights to or under any Acquired Intellectual Property or abandon, permit to lapse or otherwise dispose of any Acquired Intellectual Property (other than the abandonment of trademark registrations or applications for registration due to non-use or that are identified on Schedule 4.6(a) as not being renewed by Sellers); or (iii) amend, modify, terminate, permit to lapse or otherwise waive any rights under any Assumed Executory Contract.

### Section 6.3    Bankruptcy Actions.

(a)     On the Petition Date, Sellers filed and served a motion (together with supporting papers and with proper notice thereof) on interested parties as required by the Bankruptcy Code and Bankruptcy Rules (the "Sale Motion") seeking entry of, among other things, the Sale Order on the Bankruptcy Court's docket no later than February 16, 2017. Sellers shall use commercially reasonable efforts to cause the Bankruptcy Court to (x) enter a bid procedures order setting the schedule for the competing bid deadline, auction and sale hearing in form and substance reasonably satisfactory to Purchaser and (y) hold the Sale Hearing on or promptly after February 23, 2017. The Sale Motion shall:

(i)     seek the Bankruptcy Court's approval of this Agreement, Sellers' performance under this Agreement, and the assumption and the assignment of the Assumed Executory Contracts without adequate assurance of future performance liability pursuant to section 365(f)(2) of the Bankruptcy Code, except Purchaser's promise to perform following the Closing obligations under the Assumed Executory Contracts; and

(ii)     identify the Assumed Executory Contracts (as set forth on Schedule 2.1(a)(ii) attached hereto, as the same may be modified pursuant to Section 2.2) by (A) the date of the Assumed Executory Contracts (if available), and (B) the name and address of the other parties to the Assumed Executory Contracts as an exhibit to the Sale Motion. Such exhibit shall set forth the related Cure Costs under each of such Assumed Executory Contracts as determined by Sellers based on the Books and Records; provided, in cases which Sellers are unable to establish that a default exists, the relevant cure amount shall be set at $0.00.

17

(b)    Sellers will provide Purchaser with a reasonable opportunity to review and comment upon all material motions, applications (other than applications seeking to retain professional advisors), notices, schedules and supporting papers prepared by Sellers (including forms of orders) prior to the filing thereof in the Chapter 11 Cases with respect to the transactions contemplated hereby, all of which shall be reasonably acceptable to Purchaser.

(c)    Promptly after filing the Sale Motion on the Bankruptcy Court's docket, Sellers shall serve notice (in form and substance reasonably acceptable to Purchaser) on all parties to whom service of such notice is required or advisable pursuant to the Bankruptcy Code (including all parties to the Assumed Executory Contracts and all Persons who would appear as potentially holding a Lien on any search conducted to determine those Persons asserting a Lien on the Acquired Intellectual Property, and all Persons with pending or threatened claims with respect to any Acquired Asset to whom service of the Sale Notice (as defined in the proposed Sale Order) is required or advisable pursuant to the Bankruptcy Code), disclosing the salient terms of this Agreement, the identity of Purchaser and the transactions contemplated hereby.

**Section 6.4    Superior Offers**. From and after the date hereof, Purchaser agrees and acknowledges that Sellers and their representatives and Affiliates may then continue soliciting inquiries, proposals or offers for the Acquired Assets in connection with any Alternative Transaction.

**Section 6.5    Intellectual Property License**. Purchaser hereby grants to Sellers a royalty free license within the United States only, with the right to grant sublicenses to its agents, to use the Trademarks and Customer Lists (subject to applicable Data Security Requirements) included in the Acquired Intellectual Property solely in connection with (i) the marketing, promotion, distribution, and sale of the Inventory, effective upon the Closing and continuing for 30 days thereafter and (ii) winding down the Business and operations of Sellers, effective upon the Closing and continuing for six (6) months thereafter; provided, that in exercising such license with respect to the use of such Trademarks, Sellers shall (and shall require their agents to) uphold quality standards substantially the same as those maintained with respect to products sold under the Trademarks included in the Acquired Intellectual Property prior to the Closing. For the avoidance of doubt, Sellers shall have no right to manufacture (or have manufactured) any additional products following the Closing that bear or otherwise use the Trademarks. Immediately after the Closing, except as, and only to the extent expressly permitted under and in accordance with this Section 6.5, each Seller shall, and shall cause each of its Affiliates to, cease using the Names, any name similar thereto or constituting an abbreviation or extension thereof and any other trademarks, trade names, service marks, corporate names, trade names, trade dress, logos or symbols, in each case, included in the Acquired Intellectual Property.

## ARTICLE VII
## COVENANTS OF PURCHASER

**Section 7.1    Further Assurances**. Purchaser shall execute such documents and take such further actions as may be reasonably requested by Sellers to carry out the provisions of this Agreement and the transactions contemplated hereby. Purchaser shall use commercially reasonable efforts to fulfill or obtain the fulfillment of the conditions set forth in ARTICLE IX of this Agreement.

18

**Section 7.2    Taxes**. Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use, or other Taxes and recording charges due and which may be payable by reason of the sale of the Acquired Assets or the assumption of the Assumed Obligations under this Agreement or the transactions contemplated herein shall be borne and timely paid fifty percent (50%) by Purchaser and fifty percent (50%) by Sellers.

**Section 7.3    Adequate Assurance Regarding Assumed Executory Contracts**. As adequate assurance of the future performance of the Assumed Executory Contracts, Purchaser covenants (A) to perform following the Closing the obligations under each Assumed Executory Contract, and (B) as Sellers may reasonably request prior to the assignment of the Assumed Executory Contracts to Purchaser, to provide reasonably requested evidence sufficient to demonstrate Purchaser's ability to perform such obligations under the Assumed Executory Contracts.

### ARTICLE VIII
### CONDITIONS PRECEDENT TO OBLIGATIONS OF PURCHASER

The obligations of Purchaser under this Agreement are, at the option of Purchaser, subject to satisfaction or waiver of the following conditions precedent on or before the Closing Date.

**Section 8.1    Warranties True as of Both Present Date and Closing Date; Covenants**.

(a)    Each of the representations and warranties of Sellers contained herein shall be true and correct in all material respects (except with respect to representations and warranties of Sellers qualified as to materiality, which shall be true and correct in all respects) on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct as of that date) with the same force and effect as though made on and as of the Closing Date.

(b)    Sellers shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Sellers on or prior to the Closing Date.

**Section 8.2    Bankruptcy Condition**. The Bankruptcy Court shall have entered the Sale Order (as provided in ARTICLE VI) and the Sale Order shall be a Final Order and be in form and substance reasonably satisfactory to Purchaser.

**Section 8.3    No Order**. No Governmental Authority shall have enacted, issued, promulgated or entered any Order which is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated hereby.

**Section 8.4    Approvals**. All terminations or expirations of waiting periods imposed (and any extension thereof) by any Governmental Authority necessary for the transactions contemplated under this Agreement, if any, shall have occurred.

19

**Section 8.5    Closing Deliveries**. Sellers shall have delivered to Purchaser a certificate signed by each Seller, dated the date of the Closing Date, certifying that the conditions specified in Section 8.1(a) and Section 8.1(b) have been satisfied as of the Closing.

## ARTICLE IX
## CONDITIONS PRECEDENT TO OBLIGATIONS OF SELLERS

The obligations of Sellers under this Agreement are, at the option of Sellers, subject to the satisfaction or waiver of the following conditions precedent on or before the Closing Date.

**Section 9.1    Warranties True as of Both Present Date and Closing Date**.

(a)     The representations and warranties of Purchaser contained herein shall be true and correct in all material respects (except with respect to representations and warranties of Sellers qualified as to materiality, which shall be true and correct in all respects) on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct as of that date in all material respects) with the same force and effect as though made by Purchaser on and as of the Closing Date.

(b)     Purchaser shall have performed and complied in all material respects with the obligations and covenants required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date.

**Section 9.2    Bankruptcy Court Approval**. The Bankruptcy Court shall have entered the Sale Order (as provided in ARTICLE VI) and the Sale Order shall be in form and substance reasonably satisfactory to Sellers.

**Section 9.3    No Order**. No Governmental Authority shall have enacted, issued, promulgated or entered any Order which is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated hereby.

**Section 9.4    Consideration**. Purchaser shall have delivered to Sellers the Purchase Price.

**Section 9.5    Approvals**. All terminations or expirations of waiting periods (and any extension thereof) imposed by any Governmental Authority necessary for the transactions contemplated under this Agreement, if any, shall have occurred.

**Section 9.6    Closing Deliveries**. Purchaser shall have delivered to Sellers a certificate signed by Purchaser, dated the date of the Closing (in form and substance reasonably satisfactory to Seller) certifying that the conditions specified in Section 9.1(a) and Section 9.1(b) above have been satisfied as of the Closing.

## ARTICLE X
## CLOSING

**Section 10.1    Closing**. Upon the terms and subject to the satisfaction of the conditions set forth in ARTICLE VIII and ARTICLE IX in this Agreement, the closing of the transaction

20

contemplated by this Agreement (the "Closing") will take place at the offices of Klehr Harrison Harvey Branzburg LLP, 919 N. Market St. Suite 1000, Wilmington, DE 19801 at 10:00 A.M. Central Standard Time no later than the first Business Day after the date on which the conditions set forth in ARTICLE VIII and ARTICLE IX have been satisfied or waived; or on such other date or place as Purchaser and the Sellers may determine (the "Closing Date").

Section 10.2    **Deliveries by Seller**. At the Closing, Sellers shall deliver or procure delivery to Purchaser each of the following:

(a)    physical possession of all of the Acquired Assets (other than any Intellectual Property);

(b)    one or more bills of sale, in form reasonably satisfactory to the parties hereto, conveying in the aggregate all of the owned personal property of Sellers included in the Acquired Assets, duly executed by Sellers;

(c)    one or more Intellectual Property assignments for registered Intellectual Property set forth on Schedule 2.1(a)(i), in form reasonably satisfactory to the parties hereto, duly executed by the relevant Seller or Sellers;

(d)    one or more assignments and assumptions of the Assumed Obligations (collectively, the "Assignment and Assumption"), in form reasonably satisfactory to the parties hereto, duly executed by the relevant Seller or Sellers;

(e)    copies of the certificate set forth in Section 8.5;

(f)    a certified copy of the Sale Order; and

(g)    such other instruments as are reasonably requested by Purchaser and otherwise necessary to consummate the transactions contemplated hereby.

Section 10.3    **Deliveries by Purchaser**. At the Closing, Purchaser will deliver to Sellers:

(a)    the Assignment and Assumption duly executed by Purchaser;

(b)    the Purchase Price;

(c)    copies of the certificate set forth in Section 9.6; and

(d)    such other instruments as are reasonably requested by Sellers and otherwise necessary to consummate the transactions contemplated hereby.

Section 10.4    **Form of Instruments**. To the extent that a form of any document to be delivered hereunder is not attached as an Exhibit hereto, such documents shall be in form and substance, and shall be executed and delivered in a manner, reasonably satisfactory to Purchaser and Sellers.

21

## ARTICLE XI
## TERMINATION

**Section 11.1** **Termination**. This Agreement may be terminated prior to the Closing as follows:

(a)    by mutual written agreement of Purchaser and Sellers;

(b)    by either Purchaser or Sellers if there shall be in effect an applicable law or Final Order restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated hereby; provided, that the right to terminate this Agreement under this Section 11.1(b) shall not be available to any party whose breach of this Agreement shall have been the cause of, or shall have resulted in the Final Order that restrains, enjoins, or prohibits the consummation of the transactions contemplated hereby;

(c)    by Purchaser (provided that Purchaser is not then in material breach of any representation, warranty, covenant, or other agreement contained herein), if there shall have been a material breach or misrepresentation of any of the representations or warranties or a material breach of any of the covenants set forth in this Agreement on the part of Sellers, which breach is not cured within ten (10) Business Days following written notice to Sellers or which breach, by its nature, cannot be cured prior to the Closing;

(d)    by Sellers (provided that no Seller is then in material breach of any representation, warranty, covenant, or other agreement contained herein), if there shall have been a material breach or misrepresentation of any of the representations or warranties or a material breach of any of the covenants set forth in this Agreement on the part of Purchaser, which breach is not cured within ten (10) Business Days following written notice to Purchaser or which breach, by its nature, cannot be cured prior to the Closing;

(e)    by Purchaser (provided that Purchaser is not then in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that one or more conditions set forth in ARTICLE VIII has not been or cannot be fulfilled or satisfied prior to the date specified in such condition (if such condition specifies a date other than the Closing Date by which such condition must be satisfied);

(f)    by Purchaser if Sellers consummate an Alternative Transaction (other than to or by Purchaser or an Affiliate of Purchaser);

(g)    by Sellers if Sellers consummate an Alternative Transaction (other than to or by Purchaser or an Affiliate of Purchaser);

(h)    by Sellers (provided that no Seller is then in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that one or more conditions set forth in ARTICLE IX has not been or cannot be fulfilled or satisfied prior to the date specified in such condition (if such condition specifies a date other than the Closing Date by which such condition must be satisfied);

(i)    [intentionally deleted];

22

(j)    by Purchaser, if (A) the Sale Order shall not have been entered by the Bankruptcy Court by the close of business on the date that is thirty-eight (38) days following the Petition Date (or by such later date as shall be mutually agreed to by Purchaser and Sellers in writing), provided that Purchaser's termination right pursuant to this Section 11.1(j)(A) may only be exercised by Purchaser within five (5) days following such date, or (B) following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed, reversed, or modified;

(k)    by either Purchaser or Sellers on any day on or after the date that is sixty (60) days following the Petition Date if the Closing shall not have been consummated by such date (or by such later date as shall be mutually agreed to by Purchaser and Sellers in writing), provided, however, that the right to terminate this Agreement under this Section 11.1(k) shall not be available to any party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing to occur on or before such date;

(l)    by Purchaser, in the event that any Chapter 11 Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code is appointed in any Chapter 11 Case; and

(m)    by Purchaser, in the event that the aggregate amount of Cure Costs exceeds the Cure Cap; provided that Purchaser may not terminate this Agreement pursuant to this Section 11.1(m) if, within ten (10) Business Days following written notice to Sellers, Sellers agree, in their sole and absolute discretion to pay such excess from the Cash Portion of the Purchase Price.

### Section 11.2    Effect of Termination.

(a)    In the event of termination of this Agreement by Purchaser or Sellers, except as otherwise provided in this Section 11.2, all rights and obligations of the parties under this Agreement shall terminate without any liability of any party to any other party. The provisions of Section 3.2, Section 3.4, Section 12.1, Section 13.1, Section 13.7, Section 13.8, Section 13.9, Section 13.10, Section 13.11 and Section 13.12 shall expressly survive the termination or expiration of this Agreement.

(b)    Notwithstanding in the event of the foregoing but without limiting Sellers' rights under Section 13.8, in the event of a termination by Sellers pursuant to Section 11.1(d), Sellers shall be entitled to retain the Deposit (together with interest accrued thereon) as damages against Purchaser in all respects for any claim against Purchaser arising under this Agreement or otherwise; provided, that Sellers' remedies shall not be limited nor be deemed limited to the Deposit.

(c)    In the event of a termination of this Agreement pursuant to Section 11.1 (other than by Sellers pursuant to Section 11.1(d)), Sellers shall instruct the Escrow Agent to return to Purchaser the Deposit (together with interest accrued thereon) in accordance with Section 3.2.

**ARTICLE XII**
**ADDITIONAL POST-CLOSING COVENANTS**

**Section 12.1   Tax Matters**. Purchaser and Sellers shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any Governmental Authority or any other proceeding). Purchaser and Sellers shall cooperate in the filing of any forms (including Form 8594 under section 1060 of the Code) with respect to such Allocation. Notwithstanding any other provision of this Agreement, the terms and provisions of this Section 12.1 shall survive the Closing.

**ARTICLE XIII**
**MISCELLANEOUS**

**Section 13.1   Expenses**. Each party hereto shall bear its own costs and expenses, including attorneys' fees, with respect to the transactions contemplated hereby. Notwithstanding the foregoing, in the event of any action or proceeding to interpret or enforce this Agreement, the prevailing party in such action or proceeding (i.e., the party who, in light of the issues contested or determined in the action or proceeding, was more successful) shall be entitled to have and recover from the non-prevailing party such costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees) as the prevailing party may incur in the pursuit or defense thereof.

**Section 13.2   Amendment**. Except as provided herein, any provision of this Agreement or the Disclosure Schedules or exhibits hereto may be amended or waived only in a writing signed by Purchaser and Sellers; provided, that any such amendment or waiver that is materially adverse to the lenders under the DIP Credit Agreement or the Prepetition Loan Documents shall require such lender's prior written consent (not to be unreasonably withheld).

**Section 13.3   Notices**. Except as otherwise expressly provided herein, all notices, demands, and other communications to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed to have been given (a) when personally delivered, (b) when transmitted via telecopy (or other facsimile device) to the number set out below or transmitted by electronic mail if the sender on the same day sends a confirming copy of such notice by a recognized overnight delivery service (charges prepaid), (c) the day following the day (except if not a Business Day, then the next Business Day) on which the same has been delivered prepaid to a reputable national overnight air courier service or (d) the third (3rd) Business Day following the day on which the same is sent by certified or registered mail, postage prepaid, in each case to the respective parties hereto at the address set forth below, or at such other address as such party may specify by written notice to the other party hereto:

To Seller:   Limited Stores, LLC
7775 Walton Parkway,
New Albany, OH 43054
Attention:   Tim Boates
Facsimile:   (734) 520-6779

24

Email: tboates@rasmanagement.com

with copy to:        Klehr Harrison Harvey Branzburg LLP
919 N. Market St. Suite 1000
Wilmington, DE 19801
Attn: Domenic E. Pacitti and Michael P. Rittinger
Facsimile: 302-426-9193 and 215-568-6603
Email: dpacitti@klehr.com and mrittinger@klehr.com

To Purchaser, to:     Limited IP Acquisition LLC
c/o Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654
Attn:  James A. Stempel
Fax:   (312) 862-2200
E-mail: james.stempel@kirkland.com

**Section 13.4  Waivers**. The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same. No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing by Sellers, in the case of a waiver by any Seller, or Purchaser, in the case of any waiver by Purchaser, and no waiver in any one or more instances shall be deemed to be a further or continuing waiver of any such condition or breach of other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

**Section 13.5  Electronic Delivery; Counterparts**. This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments hereto or thereto, may be executed in one (1) or more counterparts, all of which shall constitute one and the same instrument. Any such counterpart, to the extent delivered by means of a facsimile machine or by .pdf, .tif, .gif, .jpeg or similar attachment to electronic mail (any such delivery, an "Electronic Delivery") shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto, each other party hereto or thereto shall re execute the original form of this Agreement and deliver such form to all other parties hereto. No party hereto shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a contract, and each such party forever waives any such defense, except to the extent such defense relates to lack of authenticity.

**Section 13.6  Headings**. The headings preceding the text of the Articles and Sections of this Agreement and the Exhibits and the Schedules are for convenience only and shall not be deemed part of this Agreement.

**Section 13.7  SUBMISSION TO JURISDICTION**. THE PARTIES HEREBY AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS, AND

PROCEEDINGS RELATING TO THIS AGREEMENT OR THE OTHER AGREEMENTS CONTEMPLATED HEREIN SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY CONSENT TO THE JURISDICTION OF THE BANKRUPTCY COURT.

Section 13.8  **Specific Performance**. Each party acknowledges and agrees that (i) irreparable damage would occur in the event that any of the provisions of this Agreement are not performed in accordance with specific terms or are otherwise breached, and (ii) remedies at law would not be adequate to compensate the other party. Accordingly, each party agrees that the other party shall have the right, in addition to any other rights and remedies existing in its favor (including the release of the Deposit to Sellers, if applicable), to an injunction or injunctions to prevent breaches of the provisions of this Agreement and to enforce its rights and obligations hereunder not only by an action or actions for damages but also by an action or actions for specific performance, injunctive relief and/or other equitable relief. The right to equitable relief, including specific performance or injunctive relief, shall exist notwithstanding, and shall not be limited by, any other provision of this Agreement. Each party hereby waives any defense that a remedy at law is adequate and any requirement to post bond or other security in connection with actions instituted for injunctive relief, specific performance or other equitable remedies.

Section 13.9  **Governing Law**. All issues and questions concerning the construction, validity, interpretation and enforceability of this Agreement and the Exhibits and Schedules hereto, and all claims and disputes arising hereunder or thereunder or in connection herewith or therewith, whether purporting to sound in contract or tort, or at law or in equity, shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

Section 13.10  **Binding Nature; Assignment**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto without prior written consent of the other parties (which consent shall not be unreasonably withheld or delayed).

Section 13.11  **No Third Party Beneficiaries**. Except as set forth herein, this Agreement is solely for the benefit of the parties hereto and nothing contained herein, express or implied, is intended to confer on any Person other than (i) the parties hereto or their successors and permitted assigns, (ii) Sellers, any rights, remedies, obligations, Claims, or causes of action under or by reason of this Agreement, and (iii) with respect to the definition of Sale Order in Section 1.1, and Section 13.2, the lenders under the DIP Credit Agreement and the Prepetition Loan Documents.

Section 13.12  **Materiality; Disclosure Schedules**. As used in this Agreement, unless the context would require otherwise, the terms "material" or "material to Sellers" and the concept of "material" nature of an effect upon Sellers shall be measured relative to the entire Business, taken as a whole. There likely will be, however, included in the Disclosure Schedules and may be included elsewhere in this Agreement items which are not "material" within the meaning of

26

the immediately preceding sentence in order to avoid any misunderstanding, and such inclusion shall not be deemed to be an agreement by Sellers that such items are "material" or to further define the meaning of such term for purposes of this Agreement.

Section 13.13 <u>Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the parties to this Agreement to express their mutual intent, and no rule of strict construction shall be applied against any party. The headings of the sections and paragraphs of this Agreement have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions hereof. The Recitals form an integral part of this Agreement and are incorporated by reference into this Agreement as if they were fully restated herein. In the event a subject matter is addressed in more than one (1) representation and warranty in <u>ARTICLE IV</u>, Purchaser shall be entitled to rely only on the most specific representation and warranty addressing such matter. The specification of any dollar amount or the inclusion of any item in the representations and warranties contained in this Agreement, the Disclosure Schedules or Exhibits is not intended to imply that the amounts, or higher or lower amounts, or the items so included, or other items, are or are not required to be disclosed (including whether such amounts or items are required to be disclosed as material or threatened) or are within or outside of the ordinary course of business, and no party shall use the fact of the setting of the amounts or the fact of the inclusion of any item in this Agreement, the Disclosure Schedules, or Exhibits in any dispute or controversy between the parties hereto as to whether any obligation, item or matter not set forth or included in this Agreement, the Disclosure Schedules, or Exhibits is or is not required to be disclosed (including whether the amount or items are required to be disclosed as material or threatened) or is within or outside of the ordinary course of business for purposes of this Agreement. In addition, matters reflected in the Disclosure Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature. The information contained in this Agreement, in the Disclosure Schedules, and Exhibits hereto is disclosed solely for purposes of this Agreement, and no information contained herein or therein shall be deemed to be an admission by any party hereto to any third party of any matter whatsoever (including any violation of law or breach of contract). Any reference to any federal, state, local or foreign statute or law shall be deemed also to refer to all rules and Regulations promulgated thereunder, unless the context requires otherwise.

Section 13.14 <u>Entire Understanding</u>. This Agreement, the Exhibits, the Schedules, and the other Transaction Documents set forth the entire agreement and understanding of the parties hereto in respect to the transactions contemplated hereby and this Agreement, the Exhibits, the Schedules, and the other Transaction Documents supersede all prior agreements, arrangements and understandings relating to the subject matter hereof and are not intended to confer upon any other Person any rights or remedies hereunder.

Section 13.15 <u>Closing Actions</u>. All deliveries, payments and other transactions and documents relating to the Closing shall be interdependent, and none shall be effective unless and until all are effective (except to the extent that the party entitled to the benefit thereof has waived satisfaction or performance thereof as a condition precedent to the Closing).

27

Section 13.16 **Conflict Between Transaction Documents**. The parties hereto agree and acknowledge that to the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of any other agreement or document referred to herein, this Agreement shall govern and control.

Section 13.17 **No Survival**. The representations, warranties and covenants which require performance prior to the Closing of Sellers and Purchaser contained in this Agreement or in any instrument delivered in connection herewith shall not survive the Closing. Notwithstanding the foregoing, the covenants and agreements that by their terms are to be satisfied after the Closing Date, shall survive until satisfied in accordance with their terms.

\* \* \* \* \*

28

IN WITNESS WHEREOF, the parties hereto have caused this Amended and Restated Asset Purchase Agreement to be executed and delivered on the date first above written.

PURCHASER:

**LIMITED IP ACQUISITION LLC**

By: _____
Name:   Stefan Kaluzny
Its:      President

SELLERS:

LIMITED STORES, LLC

By: _____
Name:  Timothy Boates
Its:  Chief Restructuring Officer


THE LIMITED STORES GC, LLC

By: _____
Name:  Timothy Boates
Its:  Chief Restructuring Officer